TIMOTHY COURCHAINE
United States Attorney
District of Arizona
SARAH J. PRECUP
AUSTIN L. FENWICK
Assistant U.S. Attorneys
Arizona State Bar No. 034335
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
sarah.precup@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>Cody Christian Likens,<br><br>    Defendant. | CR No. 25-CR-01354-AMM-MSA<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION |

On October 27, 2025, the Court held an evidentiary hearing (Doc. 39) on defendant Christian Cody Likens' Motion to Suppress Evidence as a Violation of the Fourth Amendment to the United States Constitution, seeking to suppress both the traffic stop and the search of the vehicle that the defendant was driving (Doc. 26). After hearing the evidence, the Magistrate Judge issued a Report and Recommendation finding that both the stop and search were constitutional and recommending that the defendant's motion be denied. (Doc. 66.) The defendant has filed a number of objections (Doc. 72), to which the United States now responds.

**I. Facts**

On October 3, 2024, Oro Valley Police Department (OVPD) Officer Kristofer Brandstrom conducted a traffic stop of the defendant for driving on a suspended license. (Hr'g Tr. 5, 14.) During the course of that evening, two "attempt to locate" or "ATL" broadcasts went out to OVPD officers, including Officer Brandstrom. The first ATL was

broadcast around 7:00 PM. (Tr. 6:15-24.) In the ATL, the dispatcher relayed that someone had called in and reported the defendant was driving on a suspended license. (*Id.*) Per Officer Brandstrom, the dispatcher had confirmed that the defendant's license was, in fact, suspended. (Tr. 7:2-4.) Later in the evening, around 9:30 PM, a second ATL went out. (Tr. 7:11-14.) In this ATL, the dispatcher again stated that someone had called in reporting the defendant was driving on a suspended license. (Tr. 7:20-25; Pl's Ex. 2). The dispatch included the defendant's name, a description of the vehicle he was driving, and a location in Oro Valley. (Tr. 8:9-17; Pl's Ex. 2.) About 20 minutes later (Tr. 12:4), Officer Brandstrom saw the defendant driving a truck matching the description from the ATL (Pl's Ex. 3) in the same area (Pl's Ex. 1). The driver's side window of the truck was down, and Officer Brandstrom recognized the driver as the defendant. (Tr. 13:10-15.) (Officer Brandstrom had conducted a traffic stop of the defendant for the same offense approximately six months prior.) (Tr. 29:10-21, 31:16-17, 24-25, 32:1.)

Officer Brandstrom did run a records check on the defendant prior to stopping his vehicle, but could not specifically recall whether he had personally verified that the defendant's license was suspended. (Tr. 14:15-24.) He did testify that it is his typical practice to independently check whether a driver's license is suspended before pulling over a driver. (Tr. 15:18-21.) Additionally, he testified that it was his understanding that before broadcasting an ATL for driving on a suspended license, a dispatcher would confirm the license was suspended. (Tr. 15:25, 16:1-7.)

After stopping the defendant for driving on a suspended license, Officer Brandstrom exercised his discretion to place the defendant under arrest for the offense. (Tr. 18:1-17.) He then determined to tow the defendant's vehicle pursuant to OVPD practice and policy. (Tr. 19:7-16.) He testified that he was concerned the vehicle would present a traffic hazard, as it was parked on the side of Oracle Road on an uphill stretch in a dark area. (Tr. 19:17-20.)

In accordance with OVPD policy, officers conducted an inventory search of the vehicle. (Tr. 20:12-19.) Per OVPD policy, officers opened any closed or locked containers

in the vehicle, (Tr. 20:24-25, 21:1-3; 27:9-14), leading to the discovery of the firearms that form the basis for the charged offense. Officers also completed the required paperwork, a vehicle removal report. (Tr. 21:6-15; Pl's Ex. 5.) Officer Brandstrom testified that he had taken part in "hundreds" of vehicle inventory searches post-traffic stop, and that all of them were conducted at the scene before the vehicle was towed. (Tr. 27:19:24; 28:3-10.) Another OVPD officer, Officer Timothy Michael Fletcher, testified that in his time with OVPD, he had been a part of many vehicle inventory searches, "too many to recollect." (Tr. 55:9-12.) He agreed that it was common for the search to occur at the scene before the vehicle was towed. (Tr. 55:13-16.)

## II. The Court Should Overrule the Defendant's Objections and Adopt the Report and Recommendation Finding the Stop and Search Constitutional.

Several of the defendant's objections may be summarized: The defendant objects that the court found the stop constitutional based on the evidence presented at the evidentiary hearing, when the United States "has not produced the native PSAP/CAD event history, audit trail, and complete dispatcher/radio audio." (Doc. 72 at 5, 6, 8 (Objections 1, 2, 4, and 7).) Without that evidence of "proven pre-stop verification" of his suspended license, the defendant says, "the stop rests on an uncorroborated anonymous accusation." (Doc. 72 at 5.) But witness testimony is also evidence. *See, e.g.*, Ninth Circuit Model Instruction 1.3. The court reasonably and properly relied on the stopping officer's testimony and the other evidence presented at the hearing to find that the officer had reasonable suspicion to stop the defendant. (Doc. 66 at 2.)

Additionally, the defendant objects that his motion to suppress should have been granted because the stop was impermissibly prolonged. (Doc. 72 at 6, 7 (Objections 4, 6).) He points to no evidence supporting this contention, claiming that "incomplete discovery" prevents analysis of whether the stop was in fact prolonged. The record says otherwise. The stopping officer recorded the stop on his body worn camera; he turned on the camera before he made contact with the defendant. (Tr. 14:7-11.) Six timestamped videos from

officers' body worn cameras, including the stopping officer's, were disclosed to the defense on June 5, 2025. (Bates 120-125.)[1] Both the United States and defense introduced some of that footage at the evidentiary hearing. (Docs. 40, 43.) The record does not support the defendant's contention that the stop was impermissibly prolonged. To the contrary, the record shows that the defendant was arrested approximately 10 minutes after the stop was initiated (Tr. 45:11-17) and before the canine unit arrived. (Tr. 47:13-17.)

Next, the defendant objects that the impoundment of his vehicle and the resulting inventory search were unreasonable because the vehicle's registered owner was on the phone with him at the time of the stop, lived nearby, and could have responded to the scene to take possession of the vehicle. (Doc. 72 at 7.) The R&R correctly points out that officers were not obligated to address a traffic hazard posed by his vehicle in the manner most favorable to the defendant. (Doc. 66 at 6.) The officers were acting in compliance with OVPD policy, which provides that typically a vehicle must be towed "[w]henever a person in charge or in control of a vehicle is arrested" and "when the community caretaker doctrine would reasonably suggest that the vehicle should be towed." (Pl.'s Ex. 4 at 4.) "Whether an impoundment is warranted under the community caretaking doctrine depends on the location of the vehicle and the police offers' duty to prevent it from creating a hazard to other drivers . . . ." *United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008). As the R&R explains, "Officer Brandstrom testified, and his bodycam shows, that the truck was parked on an uphill slope in a dark area that lacked streetlights." (Doc. 66 at 5) (citing Tr. 19; Pl.'s Ex. 7). The officer reasonably determined the vehicle presented a traffic hazard and followed department policy in having the vehicle towed.

---

[1] The defendant and his former defense counsel both represented to the court at the *Faretta* hearing that defense counsel had provided the defendant with the entire case file and disclosure. The defendant later relayed that he found he had not received all the disclosure. The United States therefore re-disclosed Bates 120-125, among other disclosure, to the defendant on December 18, 2025.

The defendant also states that the sealing of the indictment and "'fugitive' representations" are relevant, which the United States takes to be an objection to the court's failure to consider in its analysis of the stop and search that a sealed federal indictment and arrest warrant issued for the defendant at the outset of this case. (Doc. 72 at 8.) Both are irrelevant to the suppression analysis, however, and the R&R properly does not rely on either. As the defendant himself notes, (Doc. 72 at 4), the reasonable suspicion analysis considers facts as they stood at the time of the stop. The indictment and warrant in this case, which both necessarily issued after the stop and search, are therefore wholly irrelevant.

A final note: The United States disputes the imputation of the defendant's neighbors' "hostility" toward him to OVPD. There is no indication that Officer Brandstrom heard the audio of either 911 call prior to making the stop or knew who had made the anonymous calls. Nor is there any indication that the meeting between OVPD and the defendant's neighbors was at the behest of OVPD, or evinced "hostility" on OVPD's part. *See* (Tr. 63:16-19) ("Q: And was the – were the property owners where your mother and you and Cody were living that made this request to meet with the Oro Valley police? A. It was the neighbors down the street, yes.") What Officer Brandstrom heard prior to making the stop was the ATL, which included only the defendant's name, his approximate location, a description of his vehicle, and that he was reportedly driving on a suspended license. (Tr. 8:9-17); (Pl's Ex. 2). Officer Brandstrom was familiar with the defendant, as he had stopped him before for the same offense, about six months prior. (Tr. 29:10-21, 31:16-17, 24-25, 32:1.)

The United States did not object to the R&R, however, because it agrees that even if the stop was pretextual or the officers had dual motives in conducting an inventory search of the vehicle, both the stop and the search were nonetheless constitutional. Pretextual traffic stops are constitutional, *Whren v. United States*, 517 U.S. 806, 813 (1996), and a secondary motive to investigate would not invalidate the inventory search, *United States v.*

1 | *Bowhay*, 992 F.2d 229 (9th Cir. 1993). In other words, even if the court agrees with the defendant on this point, his motion to suppress should be denied.

Lastly, the defendant requests an extension of an unspecified length to file additional objections after disclosure of the radio log for the 7:00 PM ATL. Disclosure of this radio log was made available at the U.S. Attorney's Office on January 6, 2026, and the defendant picked it up the same day. (Doc. 77). The United States will defer to the Court on the matter of an extension.

**III. Conclusion**

The Court should adopt the Magistrate Judge's Report and Recommendation, find the stop and search in this case constitutional, and deny the defendant's motion to suppress.

Respectfully submitted this 16th day of January, 2026.

TIMOTHY C. COURCHAINE
United States Attorney
District of Arizona

*s/Sarah J. Precup*
*s/Austin L. Fenwick*

SARAH J. PRECUP
AUSTIN L. FENWICK
Assistant U.S. Attorneys

Copy of the foregoing served electronically or by
other means this 16th day of January, 2026, to:
All CM/ECF participants.